## Case No. 14,196.

### TROY IRON & NAIL FACTORY v. CORNING et al.

[6 Blatchf. 328; 3 Fish. Pat. Cas. 497.] [1]

Circuit Court. N. D. New York.     March 25, 1869.

MASTER IN CHANCERY—EXCEPTIONS TO RULING—FINAL REPORT—PATENTS—INFRINGEMENT—DAMAGES.

1. An exception should always be taken on the spot to each ruling of a master which a party intends to contest. It need not then be drawn up in form, but it should be taken, by giving notice to the master, and it is his duty to note the fact in his minutes

2. Where a master admits evidence that is objected to. and reserves the questions arising on the objection, and afterward omits to pass on the objection, or decides upon it in a manner claimed to be incorrect, the first opportunity should be taken to except to his omission or alleged error in such particular

[Cited in The E. C. Scranton, Case No. 4,272; Celluloid Manuf'g Co. v. Cellonite Manuf'g Co., 40 Fed. 478.]

3. The serving of the draft report of the master, and the filing of objections thereto, is such opportunity, and, if such objections do not embrace such exceptions, it is too late to take such exceptions by way of exception to the final report of the master.

[Cited in Hatch v Indianapolis & Springfield R. Co., 9 Fed. 857; Celluloid Manuf'g Co. v. Cellonite Manuf'g Co., 40 Fed. 477.]

4. If it is proper to except at all to the final report of a master, for rulings admitting or rejecting evidence, this can only be done where objections of the same kind have been made to the draft report.

[Cited in Memphis v. Brown, 20 Wall. (87 U. S.) 322.]

5. It is somewhat doubtful, whether, strictly, any exceptions to the master's rulings on the admission or rejection of evidence, can be properly embraced in exceptions to the master's final report.

6. Reasons for applying the rule strictly in this case. and for overruling exceptions taken to the final report of the master. in respect of rulings made by him as to the admission and rejection of evidence.

7. Effect of an admission made in an answer, that the defendants had made "large profits" by the use of machinery alleged to infringe the plaintiffs' patent, upon the question of the amount of nett profits derived from such infringement, on an accounting before a master under a decree.

8. Effect of letters written by the defendants to their customers, on the same question.

9. Consideration of. the expenses and charges proper to be allowed to the defendants, in ascertaining such nett profits.

10. The true amount of the nett profit derived from using machinery, in infringement of a patent, to make articles which are sold, cannot be determined, without deducting from the value of the articles made and sold all the elements of cost in their production.

This was a bill in equity, praying for an injunction and an account. It was filed July 10, 1848. The answer was sworn to March 1, 1849. The object of the suit was to restrain the defendants [Erastus Corning, James Horner, and John F. Winslow] from using a certain improvement in machinery for making hook or brad-headed spikes, for which a patent was granted to Henry Burden, September 2, 1840, which he assigned to the plaintiffs; and to compel the defendants to account to them for the profits alleged to have been made by the defendants in the course of their unauthorized use of this patented improvement. The case was brought to hearing before this court, and, in March, 1850, a decree was rendered dismissing the bill. [Case No. 14,195.] On appeal to the supreme court. the decree below was reversed, at the December term. 1852 (14 How. [55 U. S.] 193), and the case was remanded to this court, "with instructions to enjoin the defendants perpetually from using the improved machinery with the bending lever for making hook and brad-headed spikes, patented to Henry Burden, the 2d of September, 1840, and assigned to the complainants, as set forth in the complainants' bill, and to enter a decree in favor of the complainants for the use and profits thereof, upon an account to be stated by a master, under the direction of the said circuit court," &c. The mandate of the supreme court having been filed in this court, the latter, on the 28th of June, 1853, entered a decree in conformity thereto, at the same time referring the case to Marcus T. Reynolds, Esq., as master pro hac vice, to take and state the account. Mr. Reynolds having declined to serve as such master, the court, on the 20th of October, 1853, appointed Reuben

[1] [Reported by Hon. Samuel Blatchford, District Judge, and by Samuel S. Fisher, Esq., and here reprinted by permission. 3 Fish. Pat. Cas. 497, contains only a partial report.]

H. Walworth, Esquire, in his stead. The latter, after some preliminary proceedings, commenced taking the proofs on the accounting, on the 5th of April, 1854. The hearing on this reference was continued till the 10th of June, 1864, when the evidence was closed. The master subsequently served a copy of a draft report on the counsel for the respective parties, to which, on the 4th of March, 1866, the defendants filed thirty-three. objections, and, on the 7th of the same month, the plaintiffs filed forty objections. The master made his final report in May, 1866. To this report the plaintiffs filed forty exceptions to the main conclusions of the master, and about fifteen hundred exceptions to the rulings of the master made during the progress of the hearing before him. The defendants filed nineteen exceptions to the conclusions of the master.

Elisha Foote, for plaintiffs.
William A. Sackett, for defendants.

Before NELSON, Circuit Justice; and SHIPMAN, District Judge.

SHIPMAN, District Judge. This case was set down for hearing on the exceptions, before this court, at Cooperstown, in October, 1867, when and where the counsel for the respective parties appeared, and, after consultation, concluded to submit the case on the pleadings and the evidence before the master, together with briefs and arguments thereafter to be filed. These briefs and arguments have been filed, and the whole case is now before the court, the record of the proceedings, including the arguments and the evidence taken by the master, covering nearly seven thousand printed pages. In addition to this printed matter, there are large numbers of manuscript books and papers, many of which were referred to and consulted by the master and the counsel during the progress of the hearing before him. No important portions of these, however, are now before this court as evidence. Our attention has, therefore, been confined to the printed evidence submitted by the master, and after devoting several months exclusively to its examination, and to the various questions raised by the exceptions and the arguments thereon, we proceed to state the conclusions at which we have arrived. In doing this, we shall be as brief as possible, in view of the unexampled length to which the proceedings in the case have already been carried.

The first questions to be considered are those which relate to the rulings of the master, on the hearing, on the admission or rejection of evidence, after objections of counsel. The plaintiffs have filed special exceptions to the master's report, on account of these rulings, to the number of nearly fifteen hundred. These exceptions are objected to, by the defendants, as irregularly taken, for two reasons: first, that no exceptions were taken, before the master, at the times the rulings were severally made; and, second, that these alleged errors of the master were not embraced in the objections filed by the plaintiffs with the master, to his draft report. In view of the condition of the master's minutes, this phase of the case would not be free from embarrassment, even if the plaintiffs had conformed to the rules of practice, as to the time of taking their exceptions. Many of the rulings in question were not absolute, but evidence was often received, and the questions arising on the objections of counsel were reserved. What precise disposition was ultimately made of the particular questions reserved, does not always appear. It is not easy for the court to deal with these, as it is almost or quite impossible to ascertain to what extent the evidence thus conditionally received was finally accepted or rejected by the master.

But let us take the rulings of the master that were formal and peremptory, overruling or sustaining objections to the admission of evidence at the time they were made. What are the rules of practice to be observed by the party who desires to revise such rulings? We think, that an exception should always be taken on the spot to each ruling of the master which a party intends to contest. It need not then be drawn up in form, but it should be taken, by giving notice to the master, and it is his duty to note the fact in his minutes. This is a familiar rule, constantly applied in other trials, and we see no reason why it should not be adhered to in hearings before masters. However loose the practice may, in fact, be, the rule is well settled, especially in trials at law. In Morris v. Buckley, 8 Serg. & R. 211, Tilghman, C. J., remarks: "Exceptions to evidence must be taken as soon as the court has decided to admit or reject the evidence." The same point is decided in Ligget v. Bank of Pennsylvania, 7 Serg. & R. 218, where the same judge explains the object and importance of the rule. In Poole v. Fleeger, 11 Pet. [36 U. S.] 185, 211, Mr. Justice Story remarks: "In the ordinary course of things, at the trial, if an objection is made, and overruled, as to the admission of evidence, and the party does not take any exception at the trial, he is understood to waive it. The exception need not, indeed, then be put in form, or written out at large and signed; but it is sufficient that it is taken, and the right reserved to put it in form within the time prescribed by the practice or rules of the court." The reason of this rule is founded in the interest of justice, as its observance tends to narrow the limits of controversy; for, if the party in whose favor a ruling is made is notified that an exception is taken and the question is to be revised, he can waive the point and admit or withdraw the evidence, as the case may be, and thus avoid future controversy and delay over it. This is very often done, to the advantage of one or both of the parties. The same reasons exist for the observance of the rule in hearings before masters, as in other trials.

It may be said, that this rule can have no application to the instances, on this hearing, where the master admitted evidence objected to, and reserved the questions arising on the objections. As we have already intimated, it is not always easy to determine what precise disposition was made by the master of many of these reserved questions. But, if he omitted to decide them, or ultimately decided them incorrectly, the first opportunity should have been taken to except to his omissions, or alleged errors, in this particular. This opportunity, if not presented before, occurred when the draft report was served and the parties filed their objections thereto. None of these errors are embraced in the objections then filed. Exceptions to these rulings appear, for the first time, among those presented to the master's final report, although some of them were made years before either the draft report or the final report was drawn up. It would seem, from the authorities, that, if it is proper to except at all to the master's final report, for rulings admitting or rejecting evidence, this can only be done where objections of the same kind have been made to the draft report. Lord Chief Baron Gilbert lays down the rule as follows: "The ancient rule was, that the party should never except, but where he has first objected to the draft of the report before the master, and, where there was no objection brought in, it was allowed good cause to discharge the exception; and it were to be wished that this good rule was strictly followed, since, if the party had objected, he might have shown the master his error, and the report would have been altered in that particular, and never have troubled the court." This is substantially the rule of the English court of chancery, at the present time. 2 Daniell, Ch. Prac. (3d Ed.) p. 1304. In Story v. Livingston, 13 Pet. [38 U. S.] 366, Mr. Justice Wayne, speaking for the court, says: "Strictly, in chancery practice, though it is different in some of our states, no exceptions to a master's report can be made, which were not taken before the master; the object being to save time, and to give him an opportunity to correct his errors, or reconsider his opinion." We think, therefore, that, as to any questions arising upon objections made during the hearing, and reserved by the master, they should have been embraced in the objections filed with him to his draft report; and, as to the rulings which were made final at the time the objections were taken, the exceptions should have been made and noted at once, as such rulings were made.

It is, indeed, somewhat doubtful, whether, strictly, any exceptions to the master's rulings on the admission or rejection of evidence can be properly embraced in exceptions to the master's final report. It is true that such a practice is recognized in 2 Daniell, Ch. Prac. (3d Ed.) p. 1323, but the author cites no authorities in support of it. On the contrary, in Schwarz v. Sears, Walk.

Ch. 19, and in Ward v. Jewett, Id. 45, it was expressly held, that an improper rejection of testimony is to be at once corrected by a motion to the court for an order to compel the master to receive the evidence, and not by exception to his report. See, also, the case of Tyler v. Simmons, 6 Paige, 127. But it is unnecessary to pursue this branch of the inquiry. We are entirely satisfied that these exceptions in this case were taken too late. They were taken neither when the rulings were made, nor at the first opportunity thereafter.

However much looseness there may have been in practice, or however much we might be disposed to look with indulgence upon a departure from the rules in ordinary cases, we think it our duty to apply them strictly in the present case. Any other course would be attended with delay and embarrassment. It is true, that, so far as the evidence improperly admitted is concerned, we might strike it out, though this might leave the proofs in a confused and fragmentary state. But, where the evidence was improperly rejected, we are, in effect, asked to again refer this case to a master for further proofs on many points involved in the controversy between these parties. We should not be justified in such a step unless the rules strictly required it. Neither of the parties could be benefited by it. The enormous length and cost of this litigation have already rendered it barren of any substantial advantages to either party, in view of any possible result that might be reached, even at the end of another twenty years. Ten years, two months, and five days have already been consumed in taking the proofs on this reference, and nearly two years more in settling the report. From what we know of this controversy, after devoting months to a diligent and laborious examination of the evidence, we have no doubt that another reference would consume years. Such a result is almost certain, in view of the fact that the reference would have to be to a new master, who would, in order to discharge his duty intelligently, have to examine the whole case, and, perhaps, make a new report. Such a course might be practicable were human longevity equal to what it was in the antedeluvian ages. But, twenty years having been spent in this litigation, we think that the interests of all parties require that it should be brought to a close, if this can be done by a strict application of the rules of practice. This cannot be done, however, during the present generation, if the case is again to go to a master. We, therefore, apply the rule strictly, and dismiss the fourteen hundred and seventy-two exceptions to the rulings of the master in rejecting or receiving evidence, on the ground that they were not taken in time, and are irregularly before the court.

As already stated, the object of this reference was to ascertain the amount of profits, if any, which the defendants made, by the

use of the improvement secured to Burden by the patent of September 2, 1840, and by him assigned to the plaintiffs. The article made, for which the defendants are liable to account, was the hook-headed spike, used largely in the construction and repair of railroads. The master has found the period for which the defendants are liable to account to extend from October, 1845, to April, 1853, about seven years and a half. He found it necessary, or convenient, to divide this period covered by the infringement into separate business years, and give the results of the manufacture in each year. The first business year (during the last half of which the defendants are to account) ended April 4, 1846; the second, April 3, 1847; the third, April 1, 1848; the fourth, March 31, 1849; the fifth, March 30, 1850; the sixth, May 3, 1851; the seventh, May 1, 1852; the eighth, April 2, 1853.

The following table will show the number of pounds of hook-headed spikes manufactured by the defendants by the use of the infringing machine; the cost of manufacture; the nett proceeds of the sales; and the profit or loss, during each of the business years named, as found by the master. We have simply numbered the years in their order, for brevity, and to avoid the unnecessary repetition of dates:

| | No. of pounds. | Cost. | Nett proceeds of sales. | Profit. | Loss. |
|---|---|---|---|---|---|
| 1st (½) yr. | 219,480 | $ 10,056 93 | $ 9,562 99 | | $ 493 34 |
| 2d " | 540,947 | 24,750 10 | 24,226 05 | | 524 05 |
| 3d " | 1,389,826 | 60,763 16 | 60,531 71 | | 231 45 |
| 4th " | 2,134,573 | 88,8.0 93 | 92,022 83 | $3,221 90 | |
| 5th " | 1,811,030 | 74,391 87 | 72,963 26 | | 1,428 61 |
| 6th " | 4,167,873 | 158,917 46 | 151,267 89 | | 7,649 57 |
| 7th " | 4,422,426 | 158,940 81 | 149,939 06 | | 9,001 75 |
| 8th " | 4,131,766 | 151,521 58 | 133,906 22 | | 17,615 31 |

In addition to the above, the master finds that 102,000 pounds were made, or rather sold, after the 2d of April, 1853, which, by stipulation, are to be estimated according to the scale of cost and sales of those made during the eighth business year. The nett result of the whole business, as found by the master, may be stated, in round numbers, as follows: The defendants manufactured and sold, in violation of the complainants' patent, 19,000,000 of pounds of spikes, which brought them $700,000. They made no profit, taking the whole time together. On the contrary, they sustained a loss of $34,000. We give merely proximate sums, in round numbers. They made nothing, except in the fourth business year, when their profits were a little over $3,000. During all the rest of the time, except the third business year, their losses steadily increased, reaching, in the last year, $17,615.31. This is a singular and surprising result, especially in view of the admission by the defendants in their answer, and of several important facts that are apparent on the evidence.

1. The admission in the answer. The answer was sworn to March 1, 1849, near the close of the fourth business year, by Mr. Winslow, who, as one of the parties in interest, and the active manager of this part of the business, was familiar with the whole subject of this controversy. This answer states, that the defendants admit that they "have, since the 15th of October, 1845, been engaged, and are still engaged, in manufacturing said brad or hook-headed spikes, whenever these defendants had or have a demand for the same, and that, in such manufacture, they have used, and still use, said improvement claimed by said complainants to be new and useful, and to be secured by the patent so as aforesaid granted to said Burden on the 2d day of September, 1840, and have thereby made large profits, but not to the amount of one hundred thousand dollars, as charged in said bill of complaint." This admission was deliberately made, after they had manufactured and sold over one hundred and eighty thousand dollars' worth of these spikes; and yet, according to the result arrived at by the master, they had then made but little over two thousand dollars profit. It is difficult to reconcile this with the admission of the answer, that they had made large profits. It is said, in the report, that there is nothing in the answer to show what the defendants considered large profits. This may be true; but it is correct to assume that they used those terms in their ordinary sense, and, although they are not words that give exact information, they certainly cannot be deemed to have no meaning at all, or one the reverse of what is ordinarily understood by them. Considering the time over which the business had been extended, the skill and care devoted to it, and the capital employed, the amount of profit found by the master to have accrued, at the time this answer was filed, was not only not large, but it was, on the other hand, extremely small—so small, that it hardly merited the term profit at all. It is difficult to resist the conclusion, in view of all the circumstances, that the defendants, at the time this answer was filed, looked upon this question of profit and loss in a different light from that in which it is presented in the report now before us.

2. The letters of the defendants, written to their customers, by the defendant Winslow, their business manager, touching the manufacture of these spikes, are significant evidence on this question of profit and loss. They are not the letters of an imperfectly informed clerk, or other subordinate, but of one of the partners, who shows throughout a perfect familiarity with the whole business. We give some extracts, which show their tenor. (Extracts are then given from nineteen letters, extending, in date, from September 27, 1845, to July 19, 1851, one being written in 1845, one in 1846, two in 1847, five in 1848, five in 1849, three in 1850, and two in 1851.) We have cited thus at length from these letters, because, as already intimated, we think they throw light upon the question of profit

and loss now under consideration. They were written, in the ordinary course of business, by one of the defendants, who was thoroughly conversant with all the details of the business and the state of the market, both in respect to the raw material and the manufactured article. These letters cover nearly the whole period embraced in this accounting, and were written with a full knowledge of the results of the business from year to year, as the master's report finds, "that accounts of the different departments of the defendants' manufacturing establishment or works, known as the 'Albany Iron Works,' have been closed or made up periodically, at the end of what are called business years." It is evident from these letters, that this business was conducted, from the very start, under the most favorable auspices, not as an untried experiment, but commencing after many years' experience, from which the means of making an accurate forecast must have been derived, and was carried on on a large scale, with the best machinery, and an abundance of the best material, with a conceded and growing reputation, with a large market, and wealthy corporations for customers, which the defendants were able to supply often at a day's notice, and with an increasing demand growing out of the widely acknowledged superiority of the article furnished, as compared with other kinds in the market. It is evident, too, from these letters, that, while the defendants furnished their customers with spikes manufactured from superior iron, they found their account in so doing, and charged the difference in the price between that supplied and poorer material; that they obtained a "living profit," at least, "a small profit," on the business, as they conducted it; that they found it for their interest, as well as the interest of their customers, to furnish the best article; and that, though they could have supplied one of poorer quality with "as much profit," yet it would have been at the expense of their acquired reputation, which they wisely chose not to forfeit. It is fairly inferable, also, from these letters, that they had no formidable, at least, no successful, rival in the business; for, these letters repeatedly assert, that the defendants manufactured the best article, that experience at once demonstrated that the best was the cheapest, and that all, or nearly all, their orders were for the best, those being the only ones their customers would buy or consent to use. It is true, indeed, that, in one letter, the defendants speak of being pressed by the rivalry of those who manufacture a cheaper and poorer article, yet, in the same letter, they assert emphatically, that they cannot use the best material in the manufacture of their spikes, unless consumers are willing to pay the difference between its cost and that of the poorer iron. Yet they continued the business, and used the best material, and were eager and successful in increasing the sale in the United States, down to the last. Throughout this correspondence, there

is no hint by the defendants that they were losing money, or that they desired to abandon or curtail this branch of their business, or change its relative scale of prices, though, according to the report of the master, the more they made and sold, even during the last three years, after the trade was thoroughly established, the heavier were their losses, until they rose, the last year, to over $17,000, on a business of $133,000.

3. These continued and increasing losses are not charged to any extraordinary embarrassment or unforeseen calamity. It is true that the spike-factory was burned during this period, but that was during the fifth business year, in which their entire loss, according to the master, was only $1,428.61. There was, indeed, a reduction in the prices at which the spikes were sold, after the second, and down to and including the seventh business year, but this reduction bears none of the marks of a struggle to win customers or force the market on particular occasions, but a regular lowering of rates, to make them correspond with the decline in the iron market, marked by intelligent calculation and forecast, free from the pressure of any necessity, so far as we can see, and undisturbed by any sudden irregularities, or great fluctuations in the prices or demands of the trade.

But the result arrived at by the master we have stated, and the question of its correctness is raised before us by exceptions taken to his report by both parties. These exceptions, and the long and elaborate arguments thereon, refer to and open the immense mass of evidence from which the master deduced his results. This evidence relates, of course, almost wholly, to the cost of manufacturing these spikes, including the cost of the raw material. The sum at which they were sold was easily ascertained, but, to fix the exact amount of expense which entered into the cost of their production, was, upon the plan on which this reference was conducted, (and, perhaps, would have been upon any plan that could have been adopted,) a work of immense labor and difficulty. We may say, indeed, that it was impossible to fix the exact amount of that expense, as many of the elements which entered into it had no existence in precise figures, and were incapable of being reduced to certain quantities. They were entangled with other and different branches of the defendants' large business, carried on in the same establishment, and their details were mingled with details relating to the cost of manufacture of a variety of other articles. It was, therefore, impossible to arrive at certainty, and a result was reached only through estimates, comparisons, and apportionment. These remarks apply more particularly to most of the various items of cost which entered into the manufacture other than the value of the iron, though they apply, in a measure, to that also.

We have traced and examined the evidence

in this case in detail, and now proceed to state our conclusions. We cannot add to our already prolonged labor by discussing at any great length these details which we have examined, and shall dwell only, and that briefly, on those parts of the case wherein we think the conclusions of the master must be modified.

The largest item in the cost of manufacture is embraced in the value of the iron or spike-rods out of which the spikes were made. This item constituted over four-fifths of the whole expense, as will be seen from the following statement, derived from the results set forth by the master:

In the first half year, ending April 4, 1846, the defendants made or sold 109.71 tons of hook-headed spikes, which cost them, according to the report, $10,056.93. The value of the iron is estimated at $75.55 per ton, being, in the aggregate, for the 109.71 tons, $8,288.59. In the business year ending April 3, 1847, 270.47 tons, costing $24,750.10. The value of the iron is estimated at $75.55 per ton, amounting to $20,434. In the business year ending April 1, 1848, 694.91 tons, costing $60,763.16. Value of iron, $72.65 per ton, amounting to $50,485.20. In the business year ending March 31, 1849, 1,067.28 tons, costing $88,800.95. Value of iron, $70.08, amounting to $74,794.08. In the business year ending March 30, 1850, 905.51 tons, costing $74,391.87. Value of iron, $67.51 per ton, amounting to $61,130.98. In the business year ending May 3, 1851, 2,083.68 tons, costing $158,917.46. Value of iron, $64.36 per ton, amounting to $134,106.64. In the business year ending May 1, 1852, 2,211.21 tons, costing $158,940.81. Value of iron, $60.28 per ton, amounting to $133,291.17. In the business year ending April 2, 1853, 2,056.58 tons, costing $151,521.53. Value of iron $61.88 per ton, amounting to $127,261.17.

From this statement it will be seen that the value of the iron was the principal source of expense in the manufacture of the spikes. Fixing that value, therefore, was a very important consideration, and a variety of proof was gone into, to show at what prices it should enter into the expense account of the defendants. The propriety of this will at once appear, when we consider that this value was to be settled on 9,399.35 tons, besides the 51 tons sold after the 2d of April, 1853, and which was to be fixed by stipulation. A comparatively small variation in the price of this large amount of raw material would produce a decided effect on the general result, as shown in the balance-sheet. All, or nearly all, of the important evidence before us on this point, comes from the defendants' witnesses. In the early stages of the reference, the plaintiffs offered considerable evidence, which they claimed was pertinent to the question, which was received under objections reserved by the master, but subsequently the master rejected it, on the ground that it related to a different kind and quality of iron from that which the defendants actually used. That evidence is, therefore, not before us for consideration. The defendants did not buy this iron in the form of spike-rods, but manufactured the rods themselves, at the same place where they made the spikes. No purchase price could, therefore, be proved as the measure of their value. Resort was consequently had to the sales by others of like rods, and of other forms of iron of similar quality in New York, Pennsylvania, Massachusetts, and Connecticut, and to such sales of like iron as the defendants made at their works. Upon this evidence, which we will refer to at some length hereafter, the master made an estimate of the average market value of such iron as the defendants used at their works, during each of the years for which they are to account. On this point the report says: "I have, therefore, from the evidence in this case, made an estimate of the market values in each business year, of a ton of such spike-rods as the defendants did use in manufacturing their hook-headed spikes, except that the defendants' rods were not all cropped. And schedule I, hereto annexed, and forming a part of this, my report, contains what I conclude to have been the actual market values, per gross ton, of 2,240 pounds, of such spike-rods, after making a very liberal deduction from the values testified to by the witnesses, on account of the fag-ends which were on a part of the hook-headed spike-rods used by the defendants. In the same schedule, I, I have computed the amounts of those estimated average market values, in each business year, per ton of 2,000 pounds. Those estimated values, I conclude, are not more than the real market values, at the Albany Iron Works, of the spike-rods used there, per ton of 2,000 pounds of rods, in manufacturing hook-headed spikes, made with the use of the bending lever, in the same business years respectively. But, inasmuch as the plaintiffs' counsel claimed and insisted that a deduction ought to be made from the value, at the Albany Iron Works, of the spike-rods made there by the proprietors themselves, and not purchased by them, to cover the risk and expenses of marketing such rods if they had been sold by the defendants, I have, for greater caution, concluded to make a deduction of five per cent. from these values, per ton of 2,000 pounds, which diminished values are also computed and entered in said Schedule I." The report also finds, that, "to make a ton of 2,000 pounds of hook-headed spikes, of the sizes, on an average, which were made, would require about 2,150 pounds of such spike-rods as were used for that purpose, in the several business years, at the Albany Iron Works, and that, in making a ton of 2,000 pounds of such spikes, the scrap would be about 130 pounds, and the wastage, in addition to the scrap, about 20 pounds."

The master finds the values of the iron

used to make a ton of hook-headed spikes, of 2,000 pounds, during the respective years embraced in the accounting, as follows:

| | | | | |
|---|---|---|---|---|
| 1st (½) year.... | $75 55 | 5th year.... | $67 51 |
| 2d " | 75 55 | 6th " | 64 36 |
| 3d " | 72 65 | 7th " | 60 28 |
| 4th " | 70 08 | 8th " | 61 88 |

The values were arrived at by estimating, from the evidence, the value of the iron, in gross tons of 2,240 pounds; then finding the value in nett tons of 2,000 pounds; from the last deducting five per cent.; then finding the value of 2,150 pounds, thus reduced; and from that, deducting the value of 130 pounds of scrap. The wastage, 20 pounds, of course, disappears. For example, the first (half) year, the iron is estimated:

| | |
|---|---|
| Per gross ton, at.................... | $85 00 |
| Pet nett ton, at................... | 75 89 |
| After deducting 5 per cent........... | 72 10 |
| 2,150 pounds of rods, at $72.10 per 2,000 pounds.................. | 77 50 |
| Deduct for 130 pounds of scrap, at 1½ cent per pound.................... | 1 95 |
| | $75 55 |

For the remaining years, the calculations were made in the same way, and the iron, per gross ton, was estimated as follows:

| | | | | |
|---|---|---|---|---|
| 2d year .... | $85 00 | 6th year ..... | $72 50 |
| 3d " | 82 00 | 7th " | 69 00 |
| 4th " | 79 00 | 8th " | 70 00 |
| 5th " | 76 00 | | |

We now proceed to examine the evidence upon which the estimated values of iron per pross ton were founded, confining ourselves to that offered by the defendants. The witnesses were manufacturers of iron, and were called to prove the prices at which they sold iron of a similar quality to that which the defendants put into the spikes in question. We will give the prices at which they sold from year to year, with the estimated prices allowed by the report to the defendants for the spike-rods of the latter, arranging the prices of each witness and the prices allowed by the master in parallel columns. These prices refer to gross tons of 2,240 pounds.

Philip Ripley was a manufacturer of iron at Windsor Locks, Connecticut, and made iron of a similar quality to that used by the defendants. He sold, during the period of this accounting, less than 500 nett tons, and his sales are given in parcels, about 200 in number. Whether this is the precise number of lots into which his sales were divided does not certainly appear, but, from his testimony, we infer that the quantities given were taken from his books, and were copies of the entries made from time to time. The quantities vary from a few hundred to several thousand pounds each, and were sold to various customers. There was a variety of sizes, some ten or a dozen, of various shapes, square, round, flat, &c. Some of it was in the form of spike-rods, and some in other shapes. There is a very

considerable variation in prices, even in sales apparently made at about the same time. He gave his prices as follows:

| | | | | | Allowed by Master. |
|---|---|---|---|---|---|
| 1st (½) year, | $90 | to | $100 | ............ | $85 |
| 2d " | 80 | to | 100 | ............ | 85 |
| 3d " | 77½ | to | 90 | ............ | 82 |
| 4th " | 75 | to | 80 | ............ | 79 |
| 5th " | 75 | to | 80 | ............ | 76 |
| 6th " | 65 | to | 70 | ............ | 72½ |
| 7th " | 65 | to | 70 | ............ | 69 |
| 8th " | no sales given | | | ............ | 70 |

Philip D. Borden was a large manufacturer of iron at Fall River, Massachusetts. He does not, like Ripley, give the details of his sales. The iron was sold at Fall River, Providence, Boston, and New York, as well as to customers, through correspondence. This witness does not give the prices for the precise years into which the time is divided by the master, but gives it according to the calendar years. He also gives average, instead of exact prices. His estimates appear to be confined to round and square rods of various sizes, ranging from ⅜ to ⅝ in diameter. In what quantities they were sold does not appear. His average prices are as follows:

| | | | Allowed by Master. |
|---|---|---|---|
| From Oct. 1, 1845, to Jan. 1, 1846, | $90 | .. | $85 |
| From Jan. 1, 1846, to Jan. 1, 1847, | 85 | .. | 85 |
| From Jan. 1, 1847, to Jan. 1, 1848, | 85 | .. | 82 |
| From Jan. 1, 1848, to Jan. 1, 1849, | 80 | .. | 79 |
| From Jan. 1, 1849, to Jan. 1, 1850, | 80 | .. | 76 |
| From Jan 1. 1850, to July 1, 1850, | 75 | .. | 72½ |
| From July 1, 1850, to Jan. 1, 1851, | 70 | .. | 72½ |
| From Jan. 1, 1851, to Jan. 1, 1852, | 70 | .. | 69 |
| From Jan. 1, 1852, to Jan. 1, 1853, | 65 | .. | 70 |

Of course, if the master had adjusted his division of time exactly as the witness did, he might have made some slight variations in his yearly price, though the general result would have been substantially the same.

Isaac Bortelot was an iron manufacturer in Reading, Pennsylvania. He appears to have sold his iron generally to the trade. In what quantities he sold at a single time, or to a single customer, does not appear. This firm manufactured from 1,500 to 2,000 tons annually, but this included the heavier kinds, which were made from pig iron puddled. The lighter kinds, such as spike-rods, were, as a general thing, made from wrought iron scraps, like the defendants'. The proportion of iron made from the puddled pig, and that from wrought iron scraps, does not appear. The prices given by this witness are estimates of about what the average would be. made "in his head," after looking at his books, and are as follows:

| | | | Allowed by Master. |
|---|---|---|---|
| 1st (½) year | $85 | .................. | $85 |
| 2d " | 82½ | .................. | 85 |
| 3d " | 80 | .................. | 82 |
| 4th " | 75 | .................. | 79 |
| 5th " | 75 | .................. | 76 |
| 6th " | 72½ | .................. | 72½ |
| 7th " | 70 | .................. | 69 |
| 8th " | 82½ | .................. | 70 |

Abram B. Kingsland, an iron manufacturer at Keeseville, New York, made and sold to the trade and customers generally, and manufactured nails. He gives the prices of round and square rods made of materials like the defendants', for a portion of the years in question, as follows:

|        |        |        | Allowed by Master. |
|--------|--------|--------|--------------------|
| 1st    | year,  |        |                    |
| 2d     | "      |        |                    |
| 3d (½) | year,  | $90    | $82                |
| 4th    | "      | 85     | 79                 |
| 5th    | "      | 85     | 76                 |
| 6th    | "      | 82     | 72½                |
| 7th    | "      | 80     | 69                 |
| 8th    | "      | 80     | 70                 |

It should be remarked that this witness gives "about" the average prices.

John Mitchell, an iron master at Norwich, Connecticut. He made iron of the same quality as the defendants', and sold to the trade and customers generally, and gives about the average prices as follows:

|        |        |        | Allowed by Master. |
|--------|--------|--------|--------------------|
| 1st (½)| year   | $85    | $85                |
| 2d     | "      | 85     | 85                 |
| 3d     | "      | 85     | 82                 |
| 4th    | "      | 82½    | 79                 |
| 5th    | "      | 72½    | 76                 |
| 6th    | "      | 70     | 72½                |
| 7th    | "      | 68¾    | 69                 |
| 8th    | "      | 73     | 70                 |

Nathan Rowland, an iron manufacturer in Philadelphia, made from 500 to 600 tons per annum, of the same quality as the defendants', of which 300 to 400 tons were made into round and square rods, of not more than ⅝ths of an inch in diameter. He sold generally in the market, and to ordinary customers, at the following prices:

|        |        |        | Allowed by Master. |
|--------|--------|--------|--------------------|
| 1st    | year.  |        |                    |
| 2d     | "      |        |                    |
| 3d     | "      | $75    | $82                |
| 4th    | "      | 75     | 79                 |
| 5th    | "      | 70     | 76                 |
| 6th    | "      | 70     | 72½                |
| 7th    | "      | 75     | 69                 |
| 8th    | "      | 70     | 70                 |

The witness gives about the average prices, and not the details of his sales.

There is some other evidence of the same general character, but we have given the most important, and that which shows the state of the general market in various places, as evinced by the sales of iron manufacturers under the ordinary circumstances which characterized the trade. In addition to this, it should be stated, that the defendants proved their sales of iron of a similar quality to that which they put into these spikes. These sales cover the period of accounting. They represent the sales in spike-rods, horseshoe iron, hame iron, hoop iron, hoops, and beer hoops, and include, in round numbers, about 1,000 nett tons, about 200 of which were spike-rods. The figures apparently represent a variety of separate sales, amounting to several hundred in number. The prices range higher than the average of sales by other manufacturers. The quantities varied from 50 pounds to 6,000 pounds. During the first half business year, the prices ranged from $89.60 to $112, per gross ton of 2,240 pounds; the second, the price was $89.60; the third, from $89.60 to $134.40; the fourth, $89.60; the fifth, from $75 to $90; the sixth, from $89 to $89.60; the seventh, from $80 to $85; and the eighth, from $80 to $84. The evidence of Artemas Hammond, the spike-maker and the purchaser of spike-rods, we will refer to hereafter.

It is evident, from an inspection of the report in the light of this evidence, that the master struck a fair average of the prices of the sales of the manufacturers of iron of the same quality as that used by the defendants; and, after making an allowance for the fag-ends which were on a portion of the defendants' rods, in excess of those found on the rods of others, made this average the price at which the defendants' rods are charged in their expense account, in the first instance. This estimated price per gross ton of 2,240 pounds, forms the basis of the iron account, modified only by reducing the amount to nett tons, deducting from these five per cent., then taking 2,150 pounds to make 2,000 pounds of spikes, and allowing, of that, 130 pounds for scrap, and 20 pounds for wastage. The prices of the rods, per gross tons, and per nett tons, of spikes, will appear as follows:

|        |        | Per gross ton. | Per ton of spikes. |
|--------|--------|----------------|--------------------|
| 1st (½)| year,  | $85            | $75 55             |
| 2d     | "      | 85             | 75 55              |
| 3d     | "      | 82             | 72 65              |
| 4th    | "      | 79             | 70 08              |
| 5th    | "      | 76             | 67 51              |
| 6th    | "      | 72½            | 64 36              |
| 7th    | "      | 69             | 60 28              |
| 8th    | "      | 70             | 61 88              |

These were assumed as the market prices during the respective years, at the defendants' works, and they represent a pretty fair average of the prices in other places, as shown by the sales proved by the different manufacturers who testified on the reference. No reduction was made on the nine thousand four hundred tons of raw material manufactured by the defendants, and by them turned into hook-headed spikes, by the use of the plaintiffs' patented machine, except the item for fag-ends, and the item of five per cent. The propriety of allowing for the fag-ends which were on the defendants' rods, and not on those proved to have been sold by others, is obvious. How much was allowed does not appear, but the master states that it was liberal. The five per cent. allowed was "to cover the risk and expenses of marketing such rods, if they had been sold by the defendants." The propriety of this allowance is equally obvious, in view of the fact that the defendants are allowed, in their expense account, for the risk and expense of marketing the spikes. Thus, it will be seen that, under this theory, the defendants, as iron manufacturers, sell 9,-

400 tons of spike-rods, to themselves as spike-makers, under what is equivalent to a single contract, with a regular and continuous delivery, at the same prices at which the same article was sold to different purchasers, in different localities, in quantities varying from a few hundred pounds to thirty tons. This is said to be equitable, on the ground that they ought to be allowed the market prices for their rods, and that such prices, therefore, form proper charges in their expense account. Moreover, the defendants allege, that the prices from which the master has struck his averages, were the wholesale, and not the retail, prices, and therefore furnish the only true guide on this subject. These, and other considerations, have been urged by the defendants' counsel, in an elaborate and exhaustive argument, to which we have not been inattentive.

After a careful consideration of this question of the prices at which the rods should enter into the expense account of the defendants, we are satisfied, in view of the whole evidence bearing upon it, that the conclusions of the master thereon should be modified. As has been stated, the rods were made by the defendants, and by them wrought into spikes by the use of the plaintiffs' patented machine. A large and ready market was thus furnished to the defendants for their iron, within the very precincts of their rolling-mills, under circumstances which, as we have said, were equivalent to a single and continuous contract for 9,400 tons of spike-rods. These rods were manufactured under the most favorable auspices, were of very few sizes, of one shape, and dropped from the rolls into this ready market, and were at once absorbed by a single customer. For the purposes of this case, we may properly consider the defendants, in this position, as iron manufacturers, selling their rods to themselves as spike-makers, and inquire what would have been the price at which they would readily have sold these rods, in such quantity, to any other spike-maker, supposing that the defendants had not been in the latter business. Now, no such sale has been proved in the general market. None probably could have been proved, which would have embraced any thing like the same quantity, to a single purchaser. The sales that have been proved were in comparatively small quantities, to single purchasers, and, though stated to be at wholesale prices, yet, in view of the comparative smallness of the individual sales, and the number of customers, these transactions, as contrasted with the immense quantity of one kind of iron which the defendants transferred from one department of their business to another, were more of the character of a retail, than a wholesale business. The quantity of merchandise of a single size, form, and quality, to be delivered under a single contract, all other things being equal, inevitably affects the price, up to a certain point. No law of trade is more regular in its operation than this. The reasons upon which it is founded are obvious. The manufacturer who thus deals, on a large scale, with a single transaction and a single customer, can and does produce and sell cheaper than when his business is split up into a multitude of smaller transactions. He forecasts the future, and buys his raw material, and works it up under circumstances which he can control, and proceeds with greater certainty, uniformity, and economy.

We, therefore, think, that the circumstances under which the defendants transferred this large quantity of rods from their roll-'ng-mills to these spike-machines, should be considered, in arriving at the prices at which they should be charged in the expense account. If it is still insisted that these circumstances cannot be properly allowed to influence our decision, and that the "market price" at the defendants' works is, after all, the only true guide, it may be replied. that the evidence does not justify us in assuming that there was a market price there, or any where else, for any such quantity of rods as the defendants consumed. There was no other such market as these spike-machines furnished to the defendants' rolling-mills. We are, therefore, satisfied, that we ought not to ignore the condition of things under which the defendants, as iron-makers, furnished themselves, as spike-makers, with these rods. On the contrary, we are constrained to think that it is a proper subject for our consideration, and that its natural and legitimate effect should be allowed to operate in the reduction of the prices at which these rods are charged by the master in the defendants' expense account. We have carefully considered the extent of that reduction, and, after weighing the whole matter, are satisfied that it should be at the rate of four dollars and a half per ton of rods used to make a ton of spikes of 2,000 pounds weight. This we regard. in view of the whole evidence germane to the point, as allowing a fair price for the rods. In coming to this result, we have not overlooked the testimony of the defendants' witness Hammond, so earnestly pressed upon our attention by the plaintiffs' counsel, but we have not attached any very great importance to it. It is true that he states that. for three of the years covered by the periods of accounting. the firm of Adams & Hammond, of which he was a member, made about 200 tons of spikes per annum. They received all their rods from the Plymouth Iron Company, and they were of the same quality of wrought iron scrap rods as those used by the defendants. They were received under a single contract, and at a price $5:60 per ton less. on the average. than the master has allowed the defendants for their rods during the same years. Still. this was comparatively a limited transaction. the whole circumstances connected with which may

not be before us, and the witness who testified to it did not seem to have a very clear idea of the iron market at the time to which his testimony referred. He thought that the market price of iron advanced some in the latter part of 1845, and continued to advance for two or three years afterward; but in this he was mistaken. As the whole evidence shows, iron did not rise, but continued steadily to decline, during nearly the entire period covered by the accounting, and down to the last year, when there appears to have been a slight reaction. Still, as we have already remarked, we do not attach any very great importance to the facts testified to by this witness, though, as far as they go, they tend to show that the prices allowed by the master for the defendants' rods for the first three years is too high, and that our reduction is none too much.

This question, touching the value or price at which the spike-rods are allowed by the master, and included in the expense account of the defendants, was raised and presented by the plaintiffs' sixth exception to the report of the master. This exception is, therefore, sustained to the extent and upon the principles we have set forth. All the other points raised by this exception are overruled.

The plaintiffs' twenty-third exception raises several questions, touching the allowance, made by the master, for the "use of water-power, buildings, lands, machinery, and tools, for spike-factory purposes." The only remarks we have to make upon this exception, which includes a variety of objections, stated in detail, will relate, first, to the principle of allowing any thing at all for the use of the property; and, second, to the amount actually allowed by the master. This property we may call, for convenience, the fixed capital used by the defendants in the business of manufacturing these spikes. We use this term, to distinguish it from what is called, in another part of the case, the floating capital. The material points involved in this aspect of the case, will appear more clearly, by citing the language of the report. The master says: "A part of the expenses of manufacturing the hook-headed spikes, made with the use of the bending lever, by the proprietors of the Albany Iron Works, was the value of the occupation and use of the real estate, buildings, water-power, dams, bulk-heads, water-wheels, and other fixtures and machinery, machines, and tools, exclusively employed by the spike-factory department, in the manufacture and storage of its productions, etc., and of the materials used by its mason, carpenter, blacksmith, etc., from time to time. Schedule O, hereto annexed, and forming a part of this, my report, contains an estimate, which I have made, from the testimony, of the average values, in the last half of the business year ending the 4th of April, 1846, and in each of the seven succeed-

ing business years, of the water-power, the spike-factory building, the spike-factory store house, and of the dam, bulk-head, water-wheel, and propelling machinery, and of the machinery and tools in the spike-factory. From these estimated values, which I believe to have been about the true values of this part of the spike-factory property, from time to time, according to the weight of the testimony, I have, for greater caution, and because I believed it would not alter the result of this reference, deducted ten per cent." The report then proceeds to allow eight per cent. per annum on the estimated value of this part of the spike-factory property, and to allow such a proportion of the amount as was properly chargeable to the hook-headed spikes, leaving the balance out, as belonging to the other articles manufactured in the spike-factory. He allows for the

| | | | |
|---|---|---|---|
| 1st (½) year | | $ 171 | 14 |
| 2d | " | 432 | 75 |
| 3d | " | 672 | 67 |
| 4th | " | 947 | 74 |
| 5th | " | 1,116 | 04 |
| 6th | " | 1,994 | 08 |
| 7th | " | 2,074 | 11 |
| 8th | " | 1,597 | 96 |

The total amount of these items is $9,006.49.

The plaintiffs contend, that this is in the nature of rent, for the use of premises which the defendants had already erected for their other business, and, that, therefore, it should not be allowed as an item in their expense account. But we do not see how the true amount of profit derived from the use of the machines is to be determined, without deducting, from the value of the articles made, all the elements of cost in their production. The use of shop room and tools is a necessary ingredient in the expense of manufacturing most articles, and we see no reason why it must not be estimated and allowed as part of the expense account. The case of Goodyear v. Providence Rubber Co. [Case No. 5,583] is cited by the plaintiffs, in support of their objection to this allowance. But, as that case is not reported, and the decision was oral, we are not in possession of the reasons by which it was supported. On the whole, we think, the allowance of the items embraced in this exception was correct, on principle. We have examined the evidence upon which the amount allowed by the master rests, and, although the final results at which he arrived were reached by estimates and apportionments, we cannot say that he has erred in these, or that the evidence fails to support them. As we have already stated, in another part of this opinion, certainty, in fixing many of the items of the defendants' expense account, was impossible; but we think the amount allowed by the master, under this head, was no more than reasonable. This exception is, therefore, overruled.

The plaintiffs, by their twenty-fourth ex-

ception, object to the allowance made by the master for the use of what is called floating capital. The total amount allowed by the master, under this head, was $7,692.94. We regard the principle upon which this allowance was made as correct, and, after examining the evidence, we approve of the amount allowed.

There are over fifty remaining exceptions to the conclusions of the master, on the one side and on the other, which have been discussed at great length by counsel. Of these exceptions, the evidence bearing on them, and the arguments presented, we have made a prolonged and laborious examination. We have endeavored to sift, analyze, and classify the evidence bearing upon each point raised, and, on the whole, have concluded to overrule them all. But we cannot undertake to go into the reasons that have led us to this result, as we could not do so without extending this opinion over hundreds of pages. This evidence relates to innumerable details, the discussion of which could not be compressed into the compass of an ordinary volume. We, therefore, content ourselves by stating the result at which we have arrived, touching these remaining exceptions.

Reducing the price of the spike-rods, as we have already indicated, and leaving the rest of the report to stand, we find that the amount of profits made by the defendants, in the use of the plaintiffs' patent described in the bill, between the 15th of October, 1845, and the 31st of March, 1849, after deducting the losses that subsequently accrued, is $8,475.09. The plaintiffs are, therefore, entitled to recover this sum, with interest at the rate of seven per cent. per annum, from the last-named date to the entry of the final decree in this cause.

As, upon the facts reported by the master, and not excepted to by either party, Mr. Horner is to be deemed a member of the firm, and, therefore, a codefendant, down to March 31, 1849, after which no profits were made, his withdrawal from the firm does not require to be noticed in the decree.

The rule touching the time from which interest is to be computed, which we have adopted, is liberal toward the defendants, and we have, therefore, taken no account of the trifling loss on the fifty-one tons of spikes made by the defendants, the adjustment of which was provided for by stipulation. Subject to the modification in the price of the rods, which we have indicated, let the report of the master, in this case, be confirmed, and a decree be entered for the plaintiffs, for the sum of $8,475.09, with interest from March 31, 1849, to the date of the decree, together with costs to be taxed. The clerk of this court is directed to compute the interest, and include the same, on the entry of the decree.

[For subsequent proceedings, see Cases Nos. 14,197–14,199.]